**APPEAL NO. 21-13568-CC**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

**CANDICE SORRELLS**
Plaintiff-Appellee

**vs.**

**JOSH SMITH,**
Defendant-Appellant

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

---

**APPELLANT JOSH SMITH'S INITIAL BRIEF**

---

G. Kevin Morris
Terry E. Williams
Williams, Morris & Waymire, LLC
4330 South Lee St., NE
Building 400, Suite A
Buford, Ga 30518-3027
Telephone: (678) 541-0790
Kevin@wmwlaw.com

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

## CERTIFICATE OF INTERESTED PERSONS

## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Rules of the United States Court of Appeals for the Eleventh Circuit, the undersigned counsel for Defendant-Appellant certifies that, to the best of his present information, knowledge and belief, the following is a full and complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this case and appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and other indefinable legal entities related to a party:

1.    Association County Commissioners of Georgia Interlocal Risk Management Agency, (insurer for Defendant/Appellant);

2.    Crawford, Jeff (non-appealing co-Defendant below);

3.    Dodd, Kenny (non-appealing co-Defendant below);

4.    Irwin, D. (non-appealing co-Defendant below);

5.    Long, C. Victor (counsel for Plaintiff/Appellee);

-2-

6.  Mason, Kamau K. (counsel for Plaintiff/Appellee);

7.  Morris, G. Kevin (counsel for Defendant/Appellant)

8.  Sorrells, Candice (Plaintiff/Appellee);

9.  Williams, Terry E. (counsel for Defendants/Appellant);

10. Williams, Morris & Waymire, LLC (counsel for Defendant/Appellant).

This Wednesday, February 9, 2022.

WILLIAMS, MORRIS & WAYMIRE, LLC

*/s/ G. Kevin Morris*
G. KEVIN MORRIS
Georgia Bar No. 523895
Attorney for Defendant/Appellant

Building 400, Suite A
4330 South Lee Street, NE
Buford, Georgia 30518
(678) 541-0790
(678) 541-0789
kevin@wmwlaw.com

-3-

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Smith requests oral argument to clarify the issues in this appeal and to address any questions the Court may have. Defendant Smith believes oral argument will be particularly helpful because of the important constitutional issues involved and the specific inquiry of the qualified immunity doctrine.

# TABLE OF CONTENTS

*CERTIFICATE OF INTERESTED PERSONS* ............................................ *2*

*AND CORPORATE DISCLOSURE STATEMENT* .................................... *2*

*STATEMENT REGARDING ORAL ARGUMENT* ...................................... *4*

*TABLE OF CONTENTS* ................................................................ *5*

*TABLE OF CITATIONS* ............................................................... *8*

*STATEMENT OF SUBJECT MATTER* ....................................... *14*

*AND APPELLATE JURISDICTION* ......................................... *14*

*STATEMENT OF THE ISSUES* ................................................ *15*

*STATEMENT OF THE CASE* .................................................. *15*

*SUMMARY OF ARGUMENT* .................................................. *17*

*STATEMENT OF FACTS* ....................................................... *21*

*ARGUMENT AND CITATIONS OF AUTHORITY* .................................. *37*

   *I.   ANALYTICAL FRAMEWORK FOR EVALUATING APPELLANT'S*

   *FOURTH AMENDMENT CLAIMS* ......................................... *37*

     *A.   QUALIFIED IMMUNITY PRINCIPLES*............................................*37*

*B.    QUALIFIED IMMUNITY PRINCIPLES*............................................*39*

**II.    QUALIFIED IMMUNITY PROTECTS DET. SMITH FROM MS. SORRELLS' FEDERAL MALICIOUS PROSECUTION CLAIMS.......* *42*

*A.    THE UNDISPUTED EVIDENCE FAILS TO GIVE RISE TO AN INFERENCE OF MALICE* ...........................................................*42*

*B.    THE DISTRICT COURT'S RELIANCE ON WILLIAMS v. AGUIRRE WAS ERROR*...............................................................*43*

*C.    THE UNDISPUTED EVIDENCE DEMONSTRATES THAT ALL OF THE INFORMATION WITHIN DET. SMITH'S KNOWLEDGE ESTABLISHED PROBABLE CAUSE AND SUPPORTED THE ISSUANCE OF ARREST WARRANTS FOR PARTY TO THE CRIME OF ANIMAL CRUELTY AND PARTY TO THE CRIME OF DOGFIGHTING* .............................................................................*50*

*D.    EVEN ASSUMING THAT DET. SMITH DID NOT HAVE ACTUAL PROBABLE CAUSE, THE UNDISPUTED EVIDENCE SHOWS THAT HE HAD ARGUABLE PROBABLE CAUSE*...............................................*60*

*E.    PROBABLE CAUSE FINDINGS BY THE MAGISTRATE JUDGE ARE PRESUMPTIVELY CORRECT*..........................................................*61*

*F.    DET. SMITH'S PRE-ARREST RELIANCE ON THE ADVICE OF*

*THE DISTRICT ATTORNEY DEMONSTRATES THAT HIS ACTIONS*

*WERE OBJECTIVELY REASONABLE* ......................................................62

**III.    THE DISTRICT COURT ERRED IN DENYING DET. SMITH**

**SUMMARY JUDGMENT ON PLAINTIFF'S STATE TORT CLAIMS  63**

   A.   *OFFICIAL IMMUNITY BARS PLAINTIFF'S TORT CLAIMS* ........63

   B.   *PLAINTIFF'S INTENTIONAL INFLICTION CLAIMS FAIL AS A*

   *MATTER OF LAW* ...........................................................................65

**CONCLUSION** .............................................................. **70**

**CERTIFICATE OF COMPLIANCE** ........................................... **71**

**CERTIFICATE OF SERVICE** ..................................................... **72**

## TABLE OF CITATIONS

### UNITED STATES SUPREME COURT

*Behrens v. Pelletier*, 516 U.S. 299, 116 S. Ct. 834 (1996) ..................................14

*Malley v. Briggs,* [475 U.S. 335, 345, 106 S.Ct. 1092, 1098 (1986)] ................44

*McDonough v. Smith*, 139 S. Ct. 2149, 2160, 204 L. Ed. 2d 506 (2019) ..........40

*Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 815-16 (2009) ...........39

### ELEVENTH CIRCUIT COURT OF APPEALS

*Andrews v. Scott*, 729 F. App'x 804, 808 (11th Cir. 2018) .................................39

Avery v. Davis, 700 F. App'x 949, 952 (11th Cir. 2017)....................................28

*Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1333 (11th Cir.2006) ........................64

*Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016).......................... 40, 65

*Carter v. Gore*, 557 Fed. Appx. 904, 908 (11th Cir. 2014) ................... 44, 45, 50

*Cottone v.Jenne*, 326 F.3d 1352, 1358 (11th Cir.2003) .....................................39

*Cummings v. DeKalb County,* 24 F.3d 1349, 1352 (11th Cir.1994)..................14

*Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) .....................38

*Garmon v. Lumpkin County*, 878 F.2d 1406, 1408 (11th Cir.1989) ................48

*Grider v. City of Auburn,* 618 F.3d 1240, 1257 (11thCir.2010). .......... 41, 45, 60

*Holland v. City of Auburn, Ala.*, 657 F. App'x 899, 903 (11th Cir. 2016) ........61

*Kelly v. Curtis*, 21 F.3d 1544 (11th Cir. 1994) ....................................................48

*Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir.2004)..................41

*Laskar v. Hurd*, 972 F.3d 1278, 1285 (11th Cir. 2020) .....................................40

*Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) ......................................38

*Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)) ......38

*Lowe v. Aldridge*, 958 F.2d 1565, 1570 (11th Cir. 1992) ..................................45

*Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009) ................................. 38, 39

*Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019).......................................40

*Pruitt v. Gillespie*, 625 F. App'x 374, 376 (11th Cir. 2015)...............................42

Rioux v. City of Atlanta, GA., 520 F.3d 1269, 1282 (11th Cir. 2008)..............38

*Scarborough v. Myles*, 245 F.3d 1299, 1303 n. 8 (11th Cir. 2001) ...................42

*United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) ................61

*Williams v. Aguirre*, 965 F.3d 1147, 1163 (11th Cir. 2020)............ 43, 46, 48, 50

*Williams*, 965 F.3d at 1163..................................................................................48

*Wood v. Kesler*, 323 F.3d 872, 876, 878, 882 (11th Cir. 2003),............. 43, 45, 61

*Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003) ...........................................40

## OTHER CIRCUIT COURTS OF APPEALS

*McKinney v. Richland Cty. Sheriff's Dep't*, 431 F.3d 415, 419 (4th Cir. 2005)

.................................................................................................................62

## UNITED STATES DISTRICT COURTS

*Bertuglia v. City of N.Y.*, 133 F. Supp. 3d 608, 635 (S.D.N.Y. 2015)...............67

*D. H. v. Clayton County School Dist.*, 52 FSupp.3d 1261, 1297-1298 (III) (B)

(6) (N.D. Ga. 2014) ............................................................................64

*Townsend v. Coffee County, Georgia*, 854 F. Supp.2d 1345, 1355 (S.D.Ga.

2011)..................................................................................................38

## U.S. CONSTITUTION AND FED. STATUTES

28 U.S.C. § 1291 ...................................................................................14

42 U.S.C. § 1983 ...................................................................................14

## COURT RULES

F.R.A.P. 32(a)(7)(B ...............................................................................71

Rule 26.1..................................................................................................2

## GEORGIA SUPREME COURT

*Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga.1999) ........................................64

*Cameron v. Lang*, 274 Ga. 122, 123(1), 549 S.E.2d 341 (2001) ................. 63, 64

*Coggins v. State*, 275 Ga. 479, 480 (1) (569 SE2d 505) (2002) ..........................52

*H.J. Russell & Co. v. Jones*, 250 Ga.App. 28, 30, 550 S.E.2d 450, 453 (2001) 69

*Jones v. State*, 250 Ga. 11, 295 S.E.2d 71, 1982 Ga. LEXIS 1208 (1982) ........52

*Lee v. State Farm Mut. Ins. Co.,* 272 Ga. 583, 586, 533 S.E.2d 82, 85 (2000) .69

*Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga.2007).................................................64

*Ryckeley v. Callaway*, 261 Ga. 828, 829, 412 S.E.2d 826, 827 (1992) ..............69

*Yarbray v. Southern Bell Tel. & Tel. Co.*, 261 Ga. 703, 706, 409 S.E.2d 835

(1991).....................................................................................................66

## GEORGIA COURT OF APPEALS

*Anderson v. Cobb*, 573 S.E.2d 417, 419 (Ga.Ct.App.2002) ...............................64

*Brooks v. State*, 151 Ga. App. 384, 259 S.E.2d 743 (1979) ...............................52

*Daley v. Clark*, 638 S.E.2d 376, 386 (Ga.Ct.App.2006) ....................................64

*Delong v. Domenici*, 271 Ga. App. 757, 758 (2005) ...........................................64

*Fleming v. U-Haul Co. of Georgia*, 246 Ga. App. 681, 541 S.E.2d 75, 78 (Ga.

Ct. App. 2000)......................................................................................41

*Frank v. Fleet Finance*, 238 Ga. App. 316, 318, 518 S.E.2d 717 (1999) ...........66

*Heard v. State*, 142 Ga. App. 703, 704, 236 S.E.2d 911, 912 (1977)................52

*Jarrard v. United Parcel Service*, 242 Ga. App. 58, 59, 529 S.E.2d 144 (2000)

.................................................................................................................. 65, 66

*Jones v. Warner*, 301 Ga. App. 39, 42-43, 686 S.E.2d 835, 839 (2009).............68

*Lagroon v. Lawson*, 759 S.E.2d 878, 883 (Ga.Ct.App.2014) ............................64

*Law v. Harris*, 295 Ga.App. 628, 628, 673 S.E.2d 14, 15 (2009).......................66

*Marshall v. Browning,* 712 S.E.2d 71, 75 (Ga.Ct.App.2011) ............................64

*McKissick v. S.O.A. Inc.*, 299 Ga. App. 772, 684 S.E.2d 24, 29 (Ga. Ct. 2009)41

*Moran v. State*, 139 Ga. App. 274, 275, 228 S.E.2d 216, 217 (1976). ...............53

*Northside Hospital v. Ruotanen*, 246 Ga. App. 433, 435, 541 S.E.2d 66 (2000)

.................................................................................................................65

*Odem v. Pace Acad.*,235 Ga.App. 648, 656 510 S.E.2d 326, 333 (1998)...........68

*Sheffield v. Futch*, 354 Ga. App. 661, 839 S.E.2d 294, 299 (Ga. Ct. App. 2020)

.................................................................................................................40

*Tittle v. Corso*, 256 Ga. App. 859, 862 (1) (569 SE2d 873) (2002)....................64

*Turnbull v. Northside Hosp.*, Inc., 220 Ga.App. 883, 884, 470 S.E.2d 464, 466

(1996)................................................................................................................67

*Walker v. State*, 310 Ga. App. 223, 233, 713 S.E.2d 413, 422 (2011) ..............53

*Wilcher v. Confederate Packaging, Inc.*, 287 Ga.App. 451, 453, 651 S.E.2d 790,

  792 (2007) ............................................................................................67

*Williams v. Stepler*, 227 Ga. App. 591, 594, 490 S.E.2d 167, 170 (1997).........66

## **OFFICIAL CODE OF GEORGIA**

OCGA § 16-2-20 ............................................................... 51, 53

## **GEORGIA CONSTITUTION**

Ga. Const. of 1983, Art. I, Sec. 2, Par. 9 (d) .......................................63

## STATEMENT OF SUBJECT MATTER

## AND APPELLATE JURISDICTION

Jurisdiction in the United States District Court was based on Plaintiff's federal constitutional claims brought pursuant to 42 U.S.C. § 1983. [Doc. 1 *(Complaint)*]. Following discovery, Appellant Detective Josh Smith and several non-appealing co-defendants moved for summary judgment based on federal qualified immunity and state-law official immunity. [Doc. 47 (*MSJ*)]. On September 29, 2021, the district court entered an Order granting in part and denying in part Defendants' Motion for Summary Judgment. [Doc. 64 (*Order on MSJ*)]. Most relevant, "with respect to Counts III (Fourth Amendment malicious prosecution), IV (illegal arrest), VI (false imprisonment), and VII (IIED) as to Defendant Smith['s]" defenses of qualified and official immunity. [Doc. 64, p. 60 (*MSJ Order*)]. On October 12, 2021, Det. Smith timely filed his Notice of Appeal. [Doc. 89 *(Notice of Appeal)*].

This Court has appellate jurisdiction under 28 U.S.C. § 1291 and F.R.A.P. 4(a)(1). The appeal is from the denial of immunity defenses for which an interlocutory appeal is available. *Behrens v. Pelletier*, 516 U.S. 299, 116 S. Ct. 834 (1996); *Cummings v. DeKalb County,* 24 F.3d 1349, 1352 (11ᵗʰ Cir.1994) (interlocutory appellate jurisdiction over official immunity defense).

## STATEMENT OF THE ISSUES

1) Whether qualified immunity protects Detective Smith from Plaintiff's Fourth Amendment malicious prosecution under 42 U.S.C. § 1983.

2) Whether official immunity protects Detective Smith from Plaintiff's state law illegal arrest claim.

3) Whether official immunity protects Detective Smith from Plaintiff's state law false imprisonment claim.

4) Whether official immunity protects Detective Smith from Plaintiff's state law intentional infliction of emotional distress claim.

## STATEMENT OF THE CASE

This appeal arises from the district court's denial of qualified immunity and official immunity to Polk County Detective Josh Smith. Det. Smith discovered, investigated and prosecuted one of the largest illegal dog-fighting/dog-breeding operations in Georgia history. Devecio Rowland was the mastermind of the illegal enterprise that had more than one-hundred dogs secreted deep in the woods at multiple locations and anchored to the ground with truck axles and heavy gauge chains.

Plaintiff Candice Sorrells was Devecio Rowland's "on-again/off-again" girlfriend, and she was also the mother to his daughter. At the time of

Rowland's arrest, Candice Sorrells received financial benefit from Rowland in the form of child-support; she allowed him to stay at her home, even when she wasn't there; she allowed him to use her large SUV to move dogs, dog-pens, and dog supplies; she held in her possession pharmacy-dispensed veterinarian medications that were not prescribed for her or for Rowland; she even took-in one of Rowland's mama-dogs and several puppies after he had a chance-encounter with the Animal Control Director at the address where he had most of his dogs hidden. This appeal arises from the district court's denial of qualified and official immunity to Det. Smith for his arrest of Plaintiff Sorrells for being a party to Devecio Rowland's crimes.

## SUMMARY OF ARGUMENT

The District Court's order denying summary judgment should be reversed. Detective Josh Smith had probable cause to believe that Plaintiff Candice Sorrells was a Party to the Crime of Animal Cruelty and also a Party to the Crime of Dogfighting.

Devecio Rowland, Plaintiff's boyfriend and the father to her youngest daughter, was convicted and sentenced to 107 counts of animal cruelty and 107 counts of dogfighting. He had over seventy (70) dogs secreted deep in the woods behind a vacant house in rural Polk County. He had another thirty-five (35) dogs hidden behind his parents' house. The daily maintenance for these dogs was substantial. Plaintiff routinely allowed Rowland to use her large SUV to maintain these pit bulls. She knew that he had the dogs hidden behind the vacant house, and she knew that he was using her vehicle to take them food and water. In fact, she allowed him to fill water containers up with water **from her house** to take to the dogs. When Rowland became suspicious that police were investigating him and his dogs, he gave Plaintiff Sorrells 6-7 puppies and a mother dog for safe keeping; then, when he was asked about the puppies and mother dog, he lied to police and claimed that he had given them to a friend. He lied to officers in so that the police would not catch-on to Sorrells' role in

his enterprise and also so that his puppies were not seized.

On the day that Det. Smith discovered the second location where Rowland was hiding the thirty-five (35) dogs, Sorrells large SUV was there when police arrived. At that point Rowland was in jail, leaving Sorrells herself responsible for it being there. A search of Sorrells' SUV revealed syringes and a veterinarian medication. It also smelled like dog. When Sorrells' house was searched, officers discovered photographs of dogs being abused. Those photographs had been developed at Walmart and Sorrells was listed as the customer on the outside of the Walmart envelope. The envelope also indicated that the customer had "PAID" for the photo production. Inside her refrigerator, investigators discovered prescription-only veterinarian drugs. The medicines did not have any markings on them proving that they had been lawfully dispensed to a prescribed patient, much less that they had been prescribed to Sorrells. Notably, some of the medicines in Sorrells possession are typically used to treat injuries that a dog might sustain during a dog fight. Plaintiff Sorrells told investigators where Rowland purchased food for the dogs; she said she knew where it was because she had bought food there once before. Sorrells admitted to Det. Smith that she hated dogs.

During the investigation, Det. Smith consulted with the District

Attorney responsible for the underlying prosecutions. The District Attorney told Det. Smith when he had enough evidence to charge Sorrells both as a Party to the Crime of Animal Cruelty and again for Party to the Crime of Dogfighting. When Det. Smith presented his warrant affidavit to the Magistrate Judge, he not only presented the Magistrate Judge with the information in the warrant affidavit, he also told the Magistrate Judge everything that he had seen and discovered through his investigation.

Beyond the foregoing, in 2017 the Eleventh Circuit rule was that an officer seeking a warrant needed only probable cause from the information *available to him*, rather than having to communicate all such information to the judge from whom the officer sought the warrant. To the extent that rule changed in 2020 under *Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020), the 2017 rule is the only one that matters for qualified immunity. Under the 2017 rule, qualified immunity plainly protects Detective Smith from Plaintiff's warrant application / malicious prosecution claim.

Further, the District Court erred in denying Det. Smith official immunity from Plaintiff's state law claims. The evidence presented by the Plaintiff falls well-short of the requisite actual malice. Further, the District Court erred in not dismissing Plaintiff's intentional infliction of emotional

distress claims as a matter of law.

Consequently, the District Court erred denying Det. Smith qualified immunity and official immunity in connection with his motion for complete summary judgment. Respectfully, this Court should correct those errors.

## STATEMENT OF FACTS

***Devecio Rowland's Dog-Fighting Operation***

In 2010, Devecio Rowland was charged with dogfighting and cruelty to animals, along with several drug crimes. [Doc. 47-5 *(Ex. "C" Photos and Case File)* at 19]. In 2011, he was indicted on those same charges. *Id.* Candice Sorrells and Rowland were not together at that time, but she knew about the allegations. [Doc. 53 *(C. Sorrells depo.)* at 29]. Those charges against Rowland, however, had to be dropped when a critical witness against Rowland unexpectedly died. [Doc. 47-11 *(J. Smith Decl.)* at ¶2].

Six (6) years later, Animal Control Director Jeff Crawford received a referral from the Polk County Police Department to investigate suspicious activity on Cashtown Rd. [Doc. 47-9 *(Def. Ex. "B" Crim. Tr. Trans.)* at 0074.] Specifically, a road deputy heard dogs barking behind a residence on Cashtown Rd. and he thought it warranted further investigation by Animal Control. *Id.* So, Director Crawford drove to 569 Cashtown Rd. on August 8, 2017, and he immediately heard many dogs barking. *Id.* at 75. He could not see them, but he could tell that they were in a wooded area approximately 100 yards behind the residence. *Id.*

As Dir. Crawford walked into the wooded area behind the house, he

encountered Devecio Rowland and another man; Crawford could also see approximately 20 to 30 dogs at that point. *Id.* at 76. The majority of the dogs were on five-to-six-foot logging chains that weigh approximately 25 lbs. and they were either chained to trees or a wheel axle that had been buried in the ground. *Id.*

When Dir. Crawford asked how many dogs there were, Devecio told him that there were thirty (30), that all of them were his and that he was there to feed and water them. *Id.* at 79-81. Notably though, there wasn't any food or water in sight. *Id.* Dir. Crawford noticed that many of the dogs had puncture wounds and scars on their snouts, legs and neck; he also noticed that there were dogs stuffed in 2x3, 3x3 elevated wire pens, a female in one of them and "four or five, maybe more, puppies," in the other…all of them pit bulls. *Id.* at 84-86, 90-91.

Dir. Crawford did not want to tip Rowland off, so he did not issue him a citation, but he knew that something criminal was afoot and that he needed assistance from the Polk County Police Department. *Id.* at 88. Dir. Crawford promptly notified the PCPD, but before the PCPD took any action, Crawford received another complaint, this time it was a citizen complaining. *Id.* at 89. So, he went back to Cashtown Rd. to investigate a second time. *Id.*

On Dir. Crawford's second visit, he noticed that the elevated pens with puppies and one adult dog were gone. *Id.* at 91. This concerned him because he believed that it was an indication that Devecio was starting to move the dogs to another location. *Id.* Most of the other dogs seemed to still be there, hidden deep in the woods, so he went directly to the police department and advised the chief of what he had seen and of his suspicions. *Id.* at 93-94.

At that point, PCPD Chief Dodd and the entire investigations unit, including Det. Smith, returned to Cashtown Rd.; they also secured a search warrant and began investigating the dogs behind the vacant house. *Id.* at 94. Det. Smith was named the lead investigator, and as Dir. Crawford led him down a beaten path, past empty water containers into the woods, Det. Smith could see countless dogs chained to trees and vehicle axles staked into the ground. [Doc. 47-4 *(J. Smith Inv. Sum.)* at 2]. Some of the dogs had scars on their faces and others had mange; further, there was no food or water for the dogs. [Doc. 47-9 *(Cr Trial Trans.)* at 84, 104, 161].



[Doc. 53-5 *(PCPD Cashtown Location Video #3(14 min))* at 9:19-9:22].

The first thing that the officers did was feed and water the animals. It took six (6) investigators two hours just to feed the dogs 200 lbs. of dog food. [Doc. 47-4 *(J. Smith Inv. Sum.)* at 3]. In total, officers discovered seventy-two (72) dogs deep in the woods behind Cashtown Rd. [Doc. 47-9 *(Cr Trial Trans.)* at 57].

Coincidentally, as the investigators were searching the area behind the abandoned house at Cashtown Rd, Devecio Rowland drove up in a large SUV, a gold/tan Chevrolet Tahoe, and as Rowland made his way around to the back of the abandoned house, investigators were there waiting to arrest him. [Doc. 47-4 *(J. Smith Inv. Sum.)* at 3]; [Doc. 47-9 *(Cr Trial Trans.)* at 57]. Also somewhat peculiarly, shortly after Rowland was taken into custody, a female arrived on scene; she identified herself as Candice Sorrells, Rowland's girlfriend and as the owner of the Tahoe that Rowland drove up in. *Id.*

Later that afternoon, Det. Smith interviewed Rowland and asked him whether he had any other dogs located anywhere else in Polk County; in particular, Det. Smith wanted to know about the puppies that Dir. Crawford had seen in the rabbit pens behind Cashtown but which were now gone. [Doc. 47-9 *(Cr Trial Trans.)* at 192]. Suspiciously, Rowland responded that he had moved them to a friend's house, but he couldn't provide any additional information. *Id.*

The very next day, Tuesday, August 29, 2017, while actively processing the Cashtown Road scene, Polk County Police received an anonymous tip that Rowland had over fifty more dogs at 650 Puckett Road. *Id.* at 5. Based on this new information, Det. Smith sent another officer to 650 Puckett to investigate; when they arrived, they called Det. Smith to report that Candice Sorrell's Chevrolet Tahoe was parked in the driveway. *Id.* at 5.

At that point, Det. Smith obtained a search warrant 650 Puckett Rd, where he discovered thirty-five (35) more dogs in the woods chained to axles without any food, water, or shelter. [Doc. 51 *(Smith Dep.)* at 101-02]. Investigators also located the rabbit pens that Dir. Crawford had seen behind the Cashtown Rd. residence during one of his first meetings. [Doc. 47-9 *(Cr Trial Trans.)* at 193]. "Directly off the back porch was three rabbit pens which

were the missing puppy pens from 569 Cashtown Mr. Crawford had seen previously." *Id.*

Coincidentally, on the morning of August 29, 2017, Polk County Police Chief K. Dodd stopped for breakfast at Linda's restaurant, which is where Plaintiff worked. [Doc. 52 *(K. Dodd depo.)* at 10-11]; [Doc. 51 *(J. Smith depo.)* at 9].

```
11        A    I was eating breakfast where she is a
12    waitress.  And one of her workers there, her name is
13    Carrie.  When I finished eating I went up to pay at
14    the front counter and she and, being Carrie, and
15    their boss Butch, were standing by the register and
16    they said all day Saturday she had an SUV outside
17    with dog kennels in it and she moved dogs all day
18    for Devecio.  They told me that.  I didn't ask them
19    anything.  They volunteered that information.
```

*Id.* (emphasis added).

Given that Plaintiff's Tahoe was large enough to transport the pens from Cashtown to Puckett, given that her Tahoe was located at both addresses where abused animals had been found, given that the rabbit pens had been moved from Cashtown to Puckett and given that Plaintiff's co-worker told Chief Dodd, who told Det. Smith, that Plaintiff had dog kennels in her SUV over the weekend before the Monday, August 28, 2017 arrest of Devecio

Rowland at Cashtown Rd., and given that the co-worker also reported that Plaintiff had volunteered that she had spent that Saturday moving dogs for Devecio, and given that Devecio had admitted to moving the puppies that Crawford had seen in the pens but did not give any additional information, Det. Smith decided to approach Plaintiff Sorrells to interview her. [Doc. 47-4 *(J. Smith Inv. Sum.)* at 3, 5]; [Doc. 52 *(K. Dodd depo.)* at 10-11]; [Doc. 47-9 *(Cr Trial Trans.)* at 192].

### Det. Smith Interviews Plaintiff Sorrells at Linda's Restaurant and at Her Home

On August 30, 2017, Det. Smith and Dir. Crawford drove to Linda's Restaurant, where Sorrells worked, to interview her. [Doc. 47-4 *(J. Smith Inv. Sum.)* at 6]; [Doc. 53-5 *(First Interview of Sorrells)*]. During this interview, Plaintiff acknowledged several important facts. First, while she acknowledged that she and Devecio had an on-again, off-again relationship, she struggled to characterize it at that moment "because he helps take care of my kids." [Doc. 53-5 *(First Interview of Sorrells)* at 00:25]. Second, she not only admitted to knowing that there were dogs, which were found back in the woods, located at Puckett Dr., she also knew that the dogs were Devecio's. *Id.* at 40. Third, she acknowledged having the five or six puppies, including the mama dog, that had gone missing from Cashtown Rd, but she explicitly denied holding them for

Devecio. *Id.* at 3:18. Fourth, she told Det. Smith where Devecio purchased his dog food; was able to describe the location based on the surroundings and she even told Smith that she's bought feed[1] at one of the stores. *Id.* at 5:19-5:57. She also told Det. Smith that she "don't even like dogs. Hate dogs."

During the interview, Sorrells told Det. Smith that he could come to her house after she got off work to retrieve the puppies and the mother dog. *Id.* at 04:06-04:56. And, as agreed, Det. Smith, along with Det. Irvin, went to Plaintiff's home that evening to see the animals and to speak to her a bit more about Rowland. [Doc. 51 *(J. Smith dep.)* at 13-14].

---

[1]    At footnote 12 in its Order on summary judgment, the district court took issue with the Defendants' characterization of Sorrells' statement as an admission that she purchased feed for Rowland. While Det. Smith acknowledges that plausible alternate interpretations could exist for what Sorrells said, the relevant inquiry in evaluating an officer's qualified immunity defense is, "Was the officer's interpretation objectively reasonable?" Here, in the context of telling the officers where to go to investigate Rowland buying food for his dogs, Sorrells gives the officers the name of one stores and then proceeds to give them directions to a second store. Still within the context of talking about dog food being provided for Rowland's dogs, she tells them that it is near the Alabama line, on Alabama Hwy., in a cul-de-sac, next to a grooming shop and then she says that she's been up there to get feed. Clearly, given that there is no dispute about the words that Plaintiff Sorrells used, an objectively reasonable officer could conclude that she made an admission about buying feed for Rowland's dogs. *Avery v. Davis*, 700 F. App'x 949, 952 (11th Cir. 2017) (concluding that officer's interpretation of undisputed facts was objectively reasonable).

Plaintiff again gave Det. Smith and Det. Irvin consent to enter her home. [Doc. 53-5 *(Second Interview of Sorrells)* at 00:00-00:45]; [Doc. 59-5 *(Sorrells Dep.)* at 43]; [Doc. 51 *(J. Smith dep.)* at 36-40]. In fact, she said that she had "nothing to hide. Y'all can search the whole damn house." [Doc. 59-5 *(Sorrells Dep.)* at 43-44]; [Doc. 53-5 *(Second Interview of Sorrells)* at 01:01-02:45, 13:52-14:00].

Det. Smith accepted the offer to look around, and he found the mother dog and several puppies in deplorable conditions. [Doc. 51 *(J. Smith dep.)* at 16]. They were in a small, wire crate, and were forced to lay in their own feces and urine. *Id*. Det. Smith also found a puppy hidden in Plaintiff's basement, separated from its mother. *Id*. at 21. Incredibly, the puppy was stuffed in shoe box next to Plaintiff's Christmas decorations. *Id*.; [Doc. 59-5 *(Sorrells Dep.)* at 65]; [Doc. 53-5 *(Second Interview of Sorrells)* at 16:54-17:00]. This act of deception caused Det. Smith to be concerned about the welfare of all the puppies, so he summoned Animal Control officers to Sorrells' home and she surrendered them all. [Doc. 53-5 *(Second Interview of Sorrells)* at at 55:34-57:10]; [Doc. 51 *(J. Smith dep.)* at 33-34].

Before concluding with their interview of Sorrells, Det. Smith and Det. Irvin asked her about Rowland's use of her Tahoe. Sorrells explained that, on

the days that she works, "he comes over here and he stays and he uses my car and he takes [the] kids to school." [Doc. 53-5 *(Second Interview of Sorrells)* at 26:01]. She then adds that "He uses my water out here with these barrels out here, you can go out there and look besides the steps. He fills them up and that's whatever he was supposed to be going to feed. And then he goes to 650 Puckett Rd and waits on me to get off and we go pick up the kids." *Id*. at 26:28[2].

### Rowland and Sorrells' Monitored Jail Conversations

Det. Smith and Det. Irvin started monitoring Plaintiff and Rowland's jail calls after this interaction. [Doc. 47-3 *(Search Warrants)*]. Det. Smith overheard a jail call between Plaintiff and Rowland which suggested that she was involved with dog fighting and animal cruelty. *Id*. at 4. On this call, Rowland instructed Plaintiff to go to Haney Farm Supply, Cedartown Feed and Seed[3], and Ace Hardware to "speak to the men about [Rowland] coming in

---

[2]    In footnote 12, the district court again took issue with Defendants' factual assertion that Plaintiff Sorrells "regularly allowed Rowland to borrow her Tahoe to take care of the dogs." These Defendants stand by the record evidence as being supportive of their factual assertion, but in any event, they want to make it abundantly clear that they never intended to mischaracterize evidence before the court.

[3]    Haney's is the store that Sorrells gave by name to Det. Smith during his Second Interview. Cedartown Feed and Seed is where she said that she had bought feed. [Doc. 53-5 *(Second Interview of Sorrells)* at 5:19-5:57].

every day to get supplies." *Id*. Later, after Plaintiff admitted she had Rowland's cell phone, Rowland told her to not give it to anyone. *Id*.

Because of this jail call, Det. Smith secured and executed a search warrant on Plaintiff's property on September 5, 2017. *Id*. at 2. The search yielded, among other things: twenty-five photographs of dogs, presumably Rowland's. In some of the pictures, the dogs mouths were duct taped shut; other photos depicted a female dog strapped into a "rape rack" for forced copulation; the pictures helped verify lineage. Det Smith also recovered seven different types of veterinary medications, some of them were stored in Plaintiff's refrigerator. These medications did not bear Sorrells' name on them and there was no evidence that they had been legally dispensed with a prescription. [Doc. 47-6 *(PCPD Evidence Property Forms)* at 22-24]; [Doc. 47-4 *(PCPD Case Summary)* at 9]; [Doc. 47-10 *(Angus/Red Annie Photograph)*].

Of note was the envelope in which the photographs were located. It was a large, Walmart photo envelope and it had her name and telephone number on the outside. Further, it had been stamped "PAID" to evidence the fact that the customer—Candice Sorrells—had paid for the pictures to be printed. [Doc. 47-8 *(Walmart Envelope with Photo Icons and CD)* at 1].



[Doc. 47-10 *(Angus / Red Annie Photo)*(depicting a female dog in a breeding rack

or rape rack in order to validate lineage); [Doc. 47-9 *(Cr Trial Trans.)* at 285-

286].

.



*Id.*



*Id.*

Similarly, the veterinary medications in Plaintiff's possession—Dexamethasone and Baytrill 100—did not have her name affixed to the outside, indicating that it had been legally dispensed to her. Further, because of the nature of the medications—an antibiotic typically used to trat cattle and anti-inflammatory—it was reasonable to conclude that they were being used to treat dogs injured in dog-fighting. [Doc. 47-9 *(Cr Trial Trans.)* at 0027,

00279, 00291-91 (explaining that Dexamethasone and Baytril are restricted to use by or on the order of a licensed veterinarian); [Doc. 47-15 *(Photos of Dexamethasone and Baytrill 100 from Sorrells' Residence)* at 1-3 (reading that federal law restricts the drugs to use by or on the order of a licensed veterinarian)].

In addition to searching Plaintiff Sorrells' home, Det. Smith also searched her Chevrolet Tahoe. [Doc. 47-6 *(PCPD Evidence Property Forms)*]. The search was performed while the vehicle was still at Puckett Rd. but officers found a bottle of Catron IV4 and three used syringes inside. [Doc. 47-6 *(PCPD Evidence Property Forms)* at 1]. Det. Smith also noted that the rear compartment of Plaintiff's vehicle smelled like dogs. [Doc. 51 *(J. Smith dep.)* at 79-80].

Throughout the investigation, Det. Smith had consistent communications with the District Attorney. *Id.* at 54 ("we had been keeping him in the loop the whole time during the investigation."). Notably, after Det. Smith discovered the mama dog and puppies at Sorrells' house, the DA responded: Why "don't you go ahead and take warrants on Ms. Sorrells." *Id.* at 55. The District Attorney believed that she should have been arrested but Det. Smith chose to wait because she had agreed to help gain information from

Rowland through jail calls. *Id.* "Ms. Sorrells had agreed to try to see what Mr. Rowland would say on the recorded jail phone call." *Id.* But when Det. Smith intercepted a telephone call between Rowland and another man, wherein the unknown caller warned Rowland, "I talked to Candice. She's supposed to be trying to set you up on the phone." *Id.* at 58. From this phone call, Det. Smith concluded that Sorrells had used the unknown man to warn Rowland and that she was not going to cooperate with his investigation. *Id.* at 67.

"So based on the probable cause we had at her house and what the DA wanted, I decided to arrest her." *Id.*; [Doc. 51 *(J. Smith dep.)* at 58, 68, 73-79 (testifying that he consulted with the DA before taking Sorrells' arrest warrants]; [Doc. 53 *(C. Sorrells dep.)* at 19, 105-08]; [Doc. 47-13 *(Sorrells' Arrest Warrants)* at 1, 2]. On September 7, 2017, she was charged with 107 felony counts of being a party to the crime of animal cruelty. [Doc. 51 *(J. Smith dep.)* at 77-79]. On September 25, 2017, Det. Smith was presenting evidence during Ms. Sorrells' bond hearing, and when court took a recess, he "was instructed by the DA that he would also like" her charged with party to the crime of dog fighting. *Id.* at 77-78. "So under his direction is when I took that warrant out." *Id.* Both times that Det. Smith secured arrest warrants with the Magistrate Judge against Sorrells, he conveyed more detailed information about the case

against Sorrells than what appeared in the arrest affidavits. [Doc. 47-16 *Second Decl of J. Smith)* at ¶7.

The charges against Ms. Sorrells were no billed during the presentment of Devecio Rowland's charges to a grand jury. [Doc. 51 *(J. Smith dep.)* at 86-87. Specifically, while Det. Smith was presenting evidence to the grand jury in connection with the case against Devecio Rowland, he was asked to present evidence in connection with the charges against Ms. Sorrells. *Id.* However, Det. Smith had not been informed that the DA intended to present Ms. Sorrells' case on the same day as Rowland's and he did not have the case file against her. *Id.* As a result, the charges against Ms. Sorrells were no billed. *Id.* at 86-87.

On June 7, 2018, Devecio Rowland was convicted on 107 counts of dog-fighting and 107 counts of cruelty to animals. [Doc. 47-7 *(Rowland Conviction)* at 3-4].

## ARGUMENT AND CITATIONS OF AUTHORITY

## I.   ANALYTICAL FRAMEWORK FOR EVALUATING APPELLANT'S FOURTH AMENDMENT CLAIMS

### A. QUALIFIED IMMUNITY PRINCIPLES

In "all but exceptional cases," qualified immunity protects government

officials performing discretionary functions from lawsuits for damages brought against them in their individual capacities. Rioux v. City of Atlanta, GA., 520 F.3d 1269, 1282 (11th Cir. 2008) (internal citations and quotes omitted). This is because qualified immunity exists so that officials can "carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Townsend v. Coffee County, Georgia*, 854 F. Supp.2d 1345, 1355 (S.D.Ga. 2011)(citing *Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009); *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)) (internal punctuation omitted).

"A law-enforcement official sued under § 1983 may be protected from liability under the doctrine of qualified immunity if the official was acting within his discretionary authority and his conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Townsend*, 854 F. Supp.2d at 1355 (citing *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009); *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)) (internal punctuation omitted). "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not

entitled to qualified immunity." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

Here, Appellee does not dispute that Det. Smith was acting within his discretionary authority as a sworn police officer, so the burden shifts to Appellee to demonstrate why qualified immunity is inapplicable. *See Oliver*, 586 F.3d at 905. To do that, she must not only show (1) that Det. Smith's conduct violated her constitutional rights but also (2) that the right was clearly established at the time of the violation. *Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 815-16 (2009); *Andrews v. Scott*, 729 F. App'x 804, 808 (11th Cir. 2018) (*citing Cottone*, 326 F.3d at 1358-1359 (11th Cir. 2003)). Failure to establish either will entitled Det. Smith to qualified immunity.

The Fourth Amendment's proscription against unreasonable seizures is the issue implicated by this appeal. More specifically, the Appellee claims that Det. Smith violated her Fourth Amendment rights by maliciously prosecuting her in connection with her long-time boyfriend's brutal dog-fighting operation.

## B. QUALIFIED IMMUNITY PRINCIPLES

To prevail on a federal malicious prosecution claim, a plaintiff must prove the elements of the common law tort of malicious prosecution and a violation of the Fourth Amendment right to be free from unreasonable

seizures. *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019).

The elements of the malicious prosecution prong are: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff's favor; and (4) caused damage to the plaintiff. *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016); *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)).

Det. Smith does not dispute that elements one, three or four have been established[4]; instead, he maintains that Plaintiff Sorrells' malicious prosecution claim fails because she cannot show that Det. Smith secured her arrest warrant with malice **and** without probable cause. *Black*, 811 F.3d at 1266.

---

[4]    Det. Smith obtained warrants for Ms. Sorrells' arrest from a magistrate judge; therefore, a prosecution was instituted against her by Det. Smith. *Sheffield v. Futch*, 354 Ga. App. 661, 839 S.E.2d 294, 299 (Ga. Ct. App. 2020). The warrants that Det. Smith obtained for Sorrells' arrest were subsequently dismissed, i.e. the prosecution terminated in her favor. *Laskar v. Hurd*, 972 F.3d 1278, 1285 (11th Cir. 2020) ("We have also held that a prosecutor's unilateral dismissal of charges against a plaintiff constitutes a favorable termination."). And finally, there is evidence of an injury. *McDonough v. Smith*, 139 S. Ct. 2149, 2160, 204 L. Ed. 2d 506 (2019) (recognizing that a malicious prosecution injury occurs "as soon as the legal process is brought to bear. . . .").

Malice can be established in a variety of ways. It can be inferred when a defendant "makes a false statement to the police for achieving some personal goal." *McKissick v. S.O.A. Inc.*, 299 Ga. App. 772, 684 S.E.2d 24, 29 (Ga. Ct. 2009). It can be inferred from actions of "personal spite" or animosity or established from evidence showing that the defendant acted "with a reckless disregard for or conscious indifference to the rights of the plaintiff." *Fleming v. U-Haul Co. of Georgia*, 246 Ga. App. 681, 541 S.E.2d 75, 78 (Ga. Ct. App. 2000). And finally, malice can be inferred from the complete absence or total lack of probable cause.

Probable cause exists when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir.2004) (quotation omitted). In the context of qualified immunity, however, an officer need only have ***arguable* probable cause**, rather than actual probable cause. *Grider v. City of Auburn,* 618 F.3d 1240, 1257 (11thCir.2010). Arguable probable cause is present where reasonable officers in the same circumstances and possessing the same knowledge as the defendant could have believed that probable cause

existed. *Id.*

"Whether a crime actually was committed is irrelevant; rather, the inquiry asks whether objective facts known to the officer supported probable cause to make an arrest." *Pruitt v. Gillespie*, 625 F. App'x 374, 376 (11th Cir. 2015) (citing *Scarborough v. Myles*, 245 F.3d 1299, 1303 n. 8 (11th Cir. 2001)).

## II.    QUALIFIED IMMUNITY PROTECTS DET. SMITH FROM MS. SORRELLS' FEDERAL MALICIOUS PROSECUTION CLAIMS

### A. THE UNDISPUTED EVIDENCE FAILS TO GIVE RISE TO AN INFERENCE OF MALICE

In denying Det. Smith qualified immunity, the Plaintiff argued and the district court held with respect to the first arrest warrant that Det. Smith knew or should have known that his affidavits were insufficient to establish probable cause and that he made an intentional misstatement in connection with the mother dog being underweight and laying in her own feces. The court further opines that malice for the alleged intentional misstatement can be inferred from Det. Smith being angry that Sorrells would not assist in collecting evidence from Devecio Rowland.

With respect to the second arrest warrant, the district court again looked to the four corners of Det. Smith's arrest affidavit and concluded that Det.

Smith had completely failed to establish probable cause.

### B. THE DISTRICT COURT'S RELIANCE ON *WILLIAMS v. AGUIRRE* WAS ERROR

In 2020, this Court sought to harmonize prior malicious prosecution precedents within the Eleventh Circuit. For the reasons discussed below, *Williams* lends no support to Plaintiff's case.

### i. In 2017, Qualified Immunity Looked to All Information Known by the Officer, Not Merely the Information Presented to the Magistrate Judge in the Arrest Affidavit

The *Williams* decision held that going forward, the malicious prosecution analysis would focus on the information presented by the officer in the warrant affidavit to assess whether probable cause existed. In numerous cases decided before *Williams*, Courts "look[ed] to 'the facts and circumstances within the [arresting] officer's knowledge,'" as opposed to what particular information was provided to the magistrate judge. *Williams v. Aguirre*, 965 F.3d 1147, 1163 (11th Cir. 2020) (quoting *Wood v. Kesler*, 323 F.3d 872, 876, 878, 882 (11th Cir. 2003), and citing other cases). That was the framework for analyzing malicious prosecution claims before *Williams,* and thus, because Det. Smith applied for

the warrants at issue in this case before *Williams* was decided, it is the lens through which this Court should evaluate Sorrells' malicious prosecution claims.

Further, Det. Smith was entitled to rely upon the Court's stated rule in pre-*Williams* cases that *all the evidence known to the officer* can establish a qualified immunity defense to a claim challenging a warrant application. For qualified immunity in 2017, probable cause was not limited by information presented to the magistrate judge in the warrant application. *See, e.g., Carter v. Gore*, 557 Fed. Appx. 904, 908 (11th Cir. 2014).

Beyond that, it is far from clear that *Williams* properly considered the "all evidence" rule. The "all evidence" rule flows from a specific reading of Supreme Court precedent, and if that reading is correct then prior Eleventh Circuit cases with a different rule have no force. Either *Malley v. Briggs* and other Supreme Court cases provide for the "all evidence" rule, or they do not. Here is what the Court said in *Carter v. Gore*:

> *Malley v. Briggs,* [475 U.S. 335, 345, 106 S.Ct. 1092, 1098 (1986)] should not be read to subject officers to liability simply for leaving evidence out of an affidavit, however. Instead, *Malley* sets a standard by which to judge the overall sufficiency of an officer's evidentiary basis for seeking an arrest warrant. *Malley* explicitly states that the officer commits a violation only if her affidavit lacked probable cause *and* she "should not have *applied* for the warrant." 475 U.S. at 345, 106 S.Ct. at 1098 (emphasis added). Inherent in this language is the

> proposition that qualified immunity is not lost when all the evidence available to the officer establishes at least arguable probable cause, even if this evidence is not listed in an affidavit.

*Carter*, 557 F. App'x at 909 (*emphasis supplied*).

Regardless of anything to the contrary in *Williams*, the rule stated in *Carter* was in force at the time of Det. Smith's warrant application. *Wood*, 323 F.3d at 876, 878, 882 (looking to "the facts and circumstances within the [arresting] officer's knowledge."); *Grider*, 618 F.3d at 1256; *Lowe v. Aldridge*, 958 F.2d 1565, 1570 (11th Cir. 1992) (reviewing "the evidence known to" the officers who sought warrants). Beyond that, *Carter*'s reasoning is highly persuasive when it comes to qualified immunity against hyper-technical claims based on alleged paperwork errors.

### ii. Plaintiff Lacks Sufficient First-Hand Knowledge to Create a Fact Issue as to Whether Det. Smith Intentionally Misstated the Mother Dog's Condition in Connection With His Party to the Crime of Animal Cruelty Warrant Application

As previously noted, the *Williams* Court undertook to clarify inconsistencies in Circuit precedent on how claims of malicious prosecution should be evaluated. In particular, the *Williams* Court rejected the previously

applied "all evidence" and "any crime" rules in the context of a claim of malicious prosecution. Conversely, the *Williams* Court made certain to delineate where Circuit precedent had never wavered, *e.g.,* malicious prosecution claims predicated on intentional misstatements. *Williams*, 965 F.3d at 1169. And, it explicitly held that, when a fact issue existed as to whether an intentional misstatement was relied upon to form probable cause for a warrant, qualified immunity would not apply.

In this case, Plaintiff argued, and the district court agreed, that a fact issue existed as to whether the allegation that the mother dog was underweight and laying in her own feces that Det. Smith made in his Party to the Crime of Animal Cruelty warrant affidavit was an intentional misstatement. The Court cites to Det. Smith's deposition testimony wherein he acknowledged that, based on the events of August 31—the evening that Det. Smith picked up the mother dog, he did not believe that Sorrells was involved in crimes related to animal cruelty. [Doc. 64 *(Order on MSJ)* at 34].

What the district court failed to consider, however, is that Det. Smith did not apply for the warrants at issue until September 7, 2017, and this is significant because after the mother dog was taken by animal control, she was evaluated and photographed. "Sometime later I was provided pictures of the

female dog upon her arrival at animal control. She was severely underweight." [Doc. 51 *(J. Smith depo.)* at 20-21]. Dir. Crawford is the one who provided him the pictures that were taken at Animal Control when she going through intake. *Id.*

Plaintiff Sorrells never saw Dir. Crawford's pictures and she certainly was not present when the mother dog went through intake at Animal Control. That Det. Smith relied upon the information obtained during the intake of the mother dog, as opposed to his observations "that night," as the district court held, is significant because it means that Plaintiff lacks a competent basis to contend that his assertion in the warrant affidavit that mother dog was severely underweight was an intentional misstatement.

### iii.    Det. Smith's Warrant Affidavit for Sorrells Being a Party to the Crime of Animal Cruelty Contains Factual Allegations, Materially Distinguishing it From *Kelly* and *Garmon*

As established above, in 2017 the "all evidence" rule prevailed in the Eleventh Circuit in regard to warrant applications. *Williams v. Aguirre* points out that the Court's "malicious-prosecution caselaw is not always consistent about what information is relevant when determining whether probable cause

exists for a seizure pursuant to legal process—even before considering whether probable cause would exist without any allegedly false information." *Williams*, 965 F.3d at 1163. Ultimately, *Williams* rejected the "all evidence" rule because, in the view of the *Williams* court, the earliest circuit precedents limit the probable cause inquiry to "whether the judicial officer who made the probable-cause determination had sufficient, truthful information to establish probable cause." *Id.* The trouble is that the early precedents never discussed or specifically rejected the "all evidence" rule. Nobody brought it up.

*Williams* rejects the "all evidence" rule based upon two cases, *Kelly v. Curtis*, 21 F.3d 1544 (11th Cir. 1994), and *Garmon v. Lumpkin County*, 878 F.2d 1406, 1408 (11th Cir.1989). Both cases featured *no evidence* about what was told to the magistrate judge in the course of the warrant application, except for purely conclusory warrant affidavits that a crime was committed. In *Kelly*, the officer "swore out a conclusory affidavit stating: 'John Kelly, Jr., did commit the offense of Possession of Controlled Substance (Cocaine), in violation of Georgia State Code 16–13–39(b) at 4108 Boyd St., Savannah, Chatham County, GA in said county on or about 15th day of August, 1989.' " *Id.* at 1548. In *Garmon*, the warrant affidavit stated "only that ... Teresa Ann Garmon did ... commit the offense of false report of a crime." *Garmon*, 878 F.2d

at 1408. *Kelly* and *Garmon* were decided based on the fact that the officers had

not included any facts to support their allegation that the defendant had

violated the law. The warrant included nothing more than an allegation that

the defendant had violated each of the elements of the crime.

This case is not like *Kelly* or *Garmon*. Rather, Det. Smith included facts

in his Affidavits for Arrest:



**AFFIDAVIT FOR ARREST**

**GEORGIA, POLK COUNTY**

Personally came Josh Smith, who on oath says that, to the best of his knowledge and belief, Candace Sorrells did, in Polk County, commit the offense of Felony, Party To A Crime. Between on August 28, 2017 at 11:30 AM to August 31, 2017 at 08:00 PM. The place of occurrence of said offense being 742 Callaway Drive, Rockmart, GA 30153.

Said offense being described as of 16-2-20 Felony, Party To A Crime, 1 Count

Said Accused has committed the crime of party to the crime of Cruelty to Animals when said accused said she didn't have any knowledge of another defendant having that many dogs. Said Accused however had a female dog that had recently given birth to seven puppies who was extremely underweight and being forced to lay in her own feces. Said Accused also aided another defendant in committing over one hundred counts of Cruelty to Animals. This charge is for 107 counts.

and this affiant makes this affidavit that a warrant may issue for his/her arrest. Sworn to and subscribed before me this the 07th day of September 2017

[Doc. 47-13 *(Arrest Warrants)* at 1].

**AFFIDAVIT FOR ARREST**

**GEORGIA, POLK COUNTY**

Personally came Josh Smith, who on oath says that, to the best of his knowledge and belief, Candace Michelle Sorrells did, in Polk County, commit the offense of Felony, Party To A Crime. Between on August 28, 2017 at 11:00 AM to September 07, 2017 at 11:00 AM. The place of occurrence of said offense being 650 Puckett Road, Cedartown, GA 30125.

Said offense being described as of 16-2-20 Felony, Party To A Crime, 1 Count

Said Accused is charged with Party to a Crime, 16-2-20 O.C.G.A., Said Accused is party to the crime of Dog Fighting 16-12-37 O.C.G.A, (107 counts) when said accused helped and aided Mr. Devecio Rowland in fighting dogs. Ms. Sorrells had veterinary care products, and dog fighting literature in her residence at 742 Callaway Drive, Rockmart, GA 30153.

and this affiant makes this affidavit that a warrant may issue for his/her arrest.
Sworn to and subscribed before me this the 25th day of September 2017

*Id.* at 2.

## C. THE UNDISPUTED EVIDENCE DEMONSTRATES THAT ALL OF THE INFORMATION WITHIN DET. SMITH'S KNOWLEDGE ESTABLISHED PROBABLE CAUSE AND SUPPORTED THE ISSUANCE OF ARREST WARRANTS FOR PARTY TO THE CRIME OF ANIMAL CRUELTY AND PARTY TO THE CRIME OF DOGFIGHTING

Because this case is arose before *Williams v. Agurre*, Det. Smith was entitled to rely upon the Court's stated rule for pre-*Williams* cases that *all the evidence known to the officer* can establish a qualified immunity defense to a claim challenging a warrant application. *Carter,* 557 Fed. Appx. at 908. In other words, if the information known to the officer amounts to at least

arguable probable cause, the defendant officer will be entitled to qualified immunity. *Id.*

Here, the record shows that Det. Smith conducted a thorough investigation that required the collection of a wide array of evidence, including evidence in the form of live dogs, the execution of numerous extensive search warrants, the frequent consultation with the District Attorney and the rapid learning of a well-guarded business of dogfighting. From this comprehensive investigation, Det. Smith first sought warrants against Plaintiff Sorrells for being a party to the crime of animal cruelty. And then several weeks later, at the direction of the District Attorney, Det. Smith took additional warrants against Plaintiff Sorrells for being a party to the crime of dogfighting. The overwhelming evidence demonstrates that the information known to Det, Smith amounted to at least arguable probable cause, if not actual probable cause.

OCGA § 16-2-20(b) defines a party to a crime as being any person who:

(1) Directly commits the crime;

(2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity;

(3) Intentionally aids or abets in the commission of the crime; or

(4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

OCGA § 16-2-20(b).

Under Georgia law, it is well-settled that a person who does not directly commit a crime may be convicted upon proof that a crime was committed and that person was a party to it. *Coggins v. State*, 275 Ga. 479, 480 (1) (569 SE2d 505) (2002). Proof of a common criminal intent is required for one to be convicted as a party to a crime. *Jones v. State*, 250 Ga. 11, 295 S.E.2d 71, 1982 Ga. LEXIS 1208 (1982), *cert. denied*, 459 U.S. 1176, 103 S. Ct. 827, 74 L. Ed. 2d 1022, 1983 U.S. LEXIS 3260 (1983). Proof of criminal intent may be established through conduct, demeanor, and other circumstances connected with the act for which defendant is being prosecuted. *Brooks v. State*, 151 Ga. App. 384, 259 S.E.2d 743 (1979).

Of course, when the underlying transactions involve relatives, as in this case where Plaintiff Sorrells and Devecio Rowland share a child together, "slight circumstances are often sufficient to induce a belief that there was collusion between the parties." *Heard v. State*, 142 Ga. App. 703, 704, 236 S.E.2d 911, 912 (1977). Further, when a party who is not the actual perpetrator

of crime shares in the proceeds from the crimes or and uses it to sustain the criminal enterprise, such will be sufficient to support a conviction under OCGA § 16-2-20. *Walker v. State*, 310 Ga. App. 223, 233, 713 S.E.2d 413, 422 (2011). In fact, it is apparent that the Party to a Crime statute was broadly drafted by design, and as such, it"is appropriate to consider all circumstances surrounding [an] incident in determining whether [the defendant] was a party to the crime." *Moran v. State*, 139 Ga. App. 274, 275, 228 S.E.2d 216, 217 (1976).

In this case, it is important to begin with the undisputed fact that Devecio Rowland was convicted of 107 counts of dogfighting and another 107 counts of cruelty to animals. [Doc. 47-7 *(Rowland Conviction)* at 3-4]. Indeed, at all times relevant to the investigation of Plaintiff Sorrells, Devecio Rowland was in custody, charged with Animal Cruelty and Dogfighting. Thus, the relevant inquiry is this: *Did all of the information known to Det. Smith establish at least arguable probable cause that Plaintiff Sorrells was a Party to the Crimes of Animal Cruelty and Dogfighting.*

The first indication to Det. Smith that Candice Sorrells was aiding and abetting Devecio Rowland's animal cruelty and dogfighting operations was on August 28, 2017 when Rowland drove up to the abandoned Cashtown Rd.

residence in Candice Sorrells' gold Chevy Tahoe. Investigators discovered seventy-two (72) dogs deep in the woods behind the Cashtown residence, and it goes without saying that providing that many dogs with food and water multiple times a day would be a huge undertaking. Det. Smith testified that officers put out 200 lbs. of dog food in one feeding. [Doc. 47-4 *(J. Smith Inv. Sum.)* at 3]. Accordingly, by providing Rowland regular access to her large Chevy Tahoe so that he could transport food and water to the dogs, Plaintiff Sorrells clearly aided Devecio Rowland in managing his illegal operation.

Then, after Rowland had been arrested at Cashtown Rd., Candice Sorrells mysteriously arrives on scene at this abandoned house to take possession of her Tahoe. [Doc. 47-4 *(J. Smith Inv. Sum.)* at 3]. Admittedly, Sorrells owned the Tahoe so it was not suspicious that she would want to retrieve it, but, her out-of-the-blue arrival at the vacant house shortly after Rowland had been taken into custody suggested that she knew where he was and what he was doing. If nothing more, her arrival at the vacant residence to retrieve her vehicle established a connection between herself, Rowland and one of the two locations where Rowland secreted dogs in the woods.

Later that same day, Devecio Rowland added to the inference of a common criminal intent with Sorrells when he responded to Det. Smith's

question about the location of the puppies Dir. Crawford had seen in raised pens the previous week by saying that he had taken them to a "friend's house," but he couldn't provide any additional information. [Doc. 47-9 *(Cr Trial Trans.)* at 192]. The truth, which Det. Smith would later learn, was that Rowland had moved the puppies and the mother dog to Sorrells' house. Rowland had encountered Crawford on his property the previous week and was likely growing concerned that law enforcement were about to discover the 72 dogs tied up in the woods. Of course, moving 72 dogs would be a much larger task than moving puppies; so, it is reasonable to conclude that Rowland moved the puppies so that they would not be seized if police discovered the dogs at Cashtown Rd. And, it is reasonable to conclude that he put the dogs with someone who he trusted; that person happened to be Candice Sorrells.

The very next day, Tuesday, August 29, 2017, investigators learned that Rowland might have another fifty (50) dogs at a second location, 650 Puckett Rd. Det. Smith dispatched officers to Puckett Rd to investigate and  they reported back that Ms. Sorrells' "champagne in color Chevrolet Tahoe" was parked in the driveway. [Doc. 47-9 *(Cr Trial Trans.)* at 192]. Obviously, Det. Smith and the other investigators knew that Rowland couldn't be responsible for the Tahoe being in the driveway; he was in jail. That meant that Sorrells

had either driven the Tahoe to this second location where Rowland secreted dogs in the woods or she had allowed someone connected to this second location to drive it. Regardless of how Sorrell's Tahoe got to this second location, the fact that it was located where investigators would find another 35 dogs only served to strength her connections to Rowland and his illegal dogfighting/animal cruelty operation.

Accordingly, because it was obvious that Sorrell's Tahoe was being used in connection with Rowland's scheme, Det. Smith obtained a search warrant for the SUV and discovered three (3) used syringes and Catron IV, which is used to treat wounds on animals. [Doc. 47-6 *(PCPD Evidence Property Forms)* at 1]. Moreover, it smelled like dog on the inside, which supported objective suspicions that the Tahoe had been or was being used to transport dogs. [Doc. 51 *(J. Smith depo.)* at 79-80].

Additional evidence of Sorrells' aiding and abetting Rowland came to Det. Smith through PCPD Chief Kenny Dodd. Chief Dodd reported to Det. Smith that, on August 29, 2017, he had breakfast at Linda's, where Sorrells was a waitress, Chief Dodd reported that, as he was leaving, another waitress approached and told him that Candice had confided with her that she had been moving dogs and dog pens over the weekend of August 26-27. Specifically, she

said that Sorrells told her that they had used her vehicle to move dogs from Cashtown to Puckett. Rd. [Doc. 51 *(J. Smith depo.)* at 9]. Defendants acknowledge that this witness later denied having made such statements, but her account is not only supported by the fact that the Tahoe smelled like dog, but it is also consistent with Rowland telling Det. Smith that he had moved the puppies to a friend's house sometime between August 25th and August 28th.

Further objective evidence that Candice Sorrells was aiding and abetting Rowland was revealed on August 30, 2017 when Det. Smith interviewed her at Linda's. Sorrells told Det. Smith that she and Rowland had an on-again, off-again relationship and that it was complicated because he helped take care of her older children as well as the child that they shared. [Doc. 53-5 *(First Interview of Sorrells)* at 00:25]. Sorrells later advised Det. Smith that Rowland paid her $450 at the beginning of each month and it is undisputed that she had no idea where he got the money from. [Doc. 59-5 *(Sorrells Dep.)* at 118]; [Doc. 53-5 *(Second Interview of Sorrells)* at 9:18-9:27, 14:20-14:48].

Also, during this interview, Sorrells seemingly admitted to having aided and abetted Rowland's dogfighting enterprise when, in the context of telling Det. Smith where Rowland usually purchased his dog food, she gave Det. Smith vague directions and then admitted that, the reason she knows where

it is located is because she has "been up there to get feed." [Doc. 53-5 *(First Interview of Sorrells)* at 5:19-5:57]. Det. Smith did not follow up on this statement but it is apparent from the context of the conversation that she meant that she had been to that particular store to buy feed for their dogs.

Similarly, during Det. Smith's interview of Sorrells at her home, she told him that on the days that she works, Rowland "comes over here and he stays and he uses my car and he takes [the] kids to school." [Doc. 53-5 *(Second Interview of Sorrells)* at 26:01]. Then, after that, "[h]e uses my water out here with these barrels out here, you can go out there and look besides the steps. He fills them up and that's whatever he was supposed to be going to feed. And then he goes to 650 Puckett Rd and waits on me to get off and we go pick up the kids." *Id.* at 26:28. Clearly these statements unequivocally show that Sorrells was providing Rowland aid in the operation of his dogfighting/dog breeding operation.

And finally, some of the most inculpatory evidence that Sorrells was a party to Rowland's crimes was discovered during the execution of a search warrant at her house. That search yielded: twenty-five photographs of Rowland's dogs in various states of neglect and abuse. By way of example, the photographs included pictures of dogs duct taped into a rape rack being force

bred. Another picture was of two dogs appearing to try to pull away from one another in mid-copulation. Other pictures had the dogs' names printed below their image, presumably to assist in marketing.

Admittedly, Sorrell's mere possession of these photographs does not mean that she and Rowland share criminal intent, but there was more than just possession. Plaintiff Sorrells did not just possess the pictures; she is the one who undertook to get them developed, paid from them and then picked them up from Walmart. The outside of the envelope bears Candice Sorrells' name and telephone number. The envelope is marked "PAID". [Doc. 47-10 *(Angus/Red Annie Photograph)*]; [Doc. 47-9 *(Cr Trial Trans.)* at 285-286]. How else can she be described if not a party and partner to Rowland's dogfighting.

Similarly, investigators discovered seven (7) different veterinary medications, some of which had not been properly dispensed by a veterinarian, stored in Sorrells refrigerator and kitchen, shows that she was aiding and abetting Devecio Rowland treat dogs that had been injured while dogfighting. [Doc. 47-6 *(PCPD Evidence Property Forms)* at 22-24]; [Doc. 47-4 *(PCPD Case Summary)* at 9]; [Doc. 47-10 *(Angus/Red Annie Photograph)*]. Again, by housing and keeping these medicines, some of which had to be refrigerated, shows that Sorrells and Rowland partnered in making sure that the

injured/sick pit bulls had access to prescription level drugs when necessary.

Given that Sorrells and Rowland are related by virtue of having a child together, given that Sorrells repeatedly provided Rowland with resources that furthered his animal cruelty and dog fighting and even helped him apprehension, given that Sorrells financially benefited from  dogfighting enterprise and given all of the other surrounding circumstances and information known to Det. Smith, actual probable cause existed to obtain warrants against Candice Sorrells for being a party to Devecio Rowland's crimes of animal cruelty and dogfighting. And as such, this Court should reverse the district court's denial of qualified immunity on Plaintiff Sorrell's claims of malicious prosecution.

## D. EVEN ASSUMING THAT DET. SMITH DID NOT HAVE ACTUAL PROBABLE CAUSE, THE UNDISPUTED EVIDENCE SHOWS THAT HE HAD ARGUABLE PROBABLE CAUSE

Pre-*Williams* jurisprudence is clear. If a police officer accused of false arrest had at least arguable probable cause to make the arrest, any malicious prosecution claim against the officer stemming from that arrest fails. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 & n.25 (11th Cir. 2010) ("We . . . use the same 'arguable probable cause' standard in the qualified

immunity context for § 1983 claims for both false arrest and malicious prosecution, as both require a violation of the Fourth Amendment."); *Wood v. Kesler*, 323 F.3d 872, 882 (officer's probable cause to make the arrest "bars [the plaintiff's] § 1983 malicious prosecution claim" against the officer).

Without restating all of the facts set forth in the previous section, Det. Smith relies on those facts to show that, at the very least, he had arguable probable cause to believe that Plaintiff Sorrells' conduct aided and abetted the illegal animal cruelty and dogfighting enterprise being operated by the father of her youngest daughter, Devecio Rowland. For those reason, this Court should reverse the district court's denial of qualified immunity and direct that judgment be entered in Det. Smith's favor.

## E. PROBABLE CAUSE FINDINGS BY THE MAGISTRATE JUDGE ARE PRESUMPTIVELY CORRECT

"In determining whether or not probable cause existed, great deference is due to the magistrate's finding of probable cause." *Holland v. City of Auburn, Ala.*, 657 F. App'x 899, 903 (11th Cir. 2016); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999)("We give "[g]reat deference" to a lower court judge's determination of probable cause.").

"A reasonable officer would not second-guess [judicial probable cause]

determinations unless probable cause was plainly lacking." *McKinney v. Richland Cty. Sheriff's Dep't*, 431 F.3d 415, 419 (4th Cir. 2005). Plaintiff cannot overcome the presumption of probable cause

## F. DET. SMITH'S PRE-ARREST RELIANCE ON THE ADVICE OF THE DISTRICT ATTORNEY DEMONSTRATES THAT HIS ACTIONS WERE OBJECTIVELY REASONABLE

The undisputed evidence here is that Det. Smith continuously solicited advice from the District Attorney in connection with this case and this Plaintiff. [Doc. 51 *(J. Smith depo.)* at 53]. "[W]e had been keeping him in the loop the whole time during the investigation. So anytime something would happen, I would always call him up and let him know." *Id.* at 54. So "I told him exactly what I have told you about how we found them and everything." *Id.* And he responded, "[W]hy don't you go ahead and take warrants on Ms. Sorrells." *Id.* at 55.

Notably though, Det. Smith did not arrest her at that point. Instead, he tried to convince her to call Rowland on the jail phone to see if she could get him to offer up incriminating information. It wasn't until after Sorrells refused to help that Det. Smith capitulated to the DA and pursued warrants based on her being a Party to the Crime of Animal Cruelty.

> Partly because the DA wanted that done. At that point I realized she had, she had kind of made her stance on where she's going in the case. And I realized she wasn't, obviously not willing to help us. So based on the probable cause we had at her house and what the DA wanted, I decided to arrest her.

*Id.* at 68.

As for the Party to the Crime of Dogfighting warrants, Det. Smith testified that he was in the midst of a bond hearing for Ms. Sorrells and the DA "instructed" him to go to the magistrate judge and add warrants based on Sorrells being a Party to the Crime of Dogfighting. "So under his direction is when I took that warrant out." *Id.* at 79. In fact, had the DA not said to [Smith] that he wanted the warrant," he would not have taken it. *Id.*

## III. THE DISTRICT COURT ERRED IN DENYING DET. SMITH SUMMARY JUDGMENT ON PLAINTIFF'S STATE TORT CLAIMS

### A. OFFICIAL IMMUNITY BARS PLAINTIFF'S TORT CLAIMS

Official immunity bars Plaintiff's state law claims because Det. Smith's conduct was discretionary and there is no evidence of actual malice. *See* Ga. Const. of 1983, Art. I, Sec. 2, Par. 9 (d); *Cameron v. Lang*, 274 Ga. 122, 123(1), 549 S.E.2d 341 (2001). The Georgia Supreme Court has set a "high bar" for demonstrating the actual malice needed to overcome official immunity. *D. H.*

*v. Clayton County School Dist.*, 52 FSupp.3d 1261, 1297-1298 (III) (B) (6) (N.D. Ga. 2014). Under Georgia law an officer's "discretionary" conduct is immunized, even if performed negligently. *See, e.g., Cameron*, 274 Ga. at 125. Furthermore, a law enforcement officer's decisions to detain, arrest, and use force are discretionary functions for purposes of official immunity. *Delong v. Domenici*, 271 Ga. App. 757, 758 (2005).

Accordingly, the question is whether Plaintiff produced sufficient evidence of "actual malice" to overcome official immunity. There is no such evidence. Indeed, "frustration, irritation, and possibly even anger is not sufficient to penetrate official immunity." *Tittle v. Corso*, 256 Ga. App. 859, 862 (1) (569 SE2d 873) (2002). Even if the Court were to rule that a given act was inappropriate in some sense, that is something far different from the "actual malice" required to pierce official immunity.

> Actual malice is a demanding standard: it requires an officer to act with "a ***deliberate intention to do a wrongful act***." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga.1999). True, a jury can infer actual malice based on an officer's conduct. *See Lagroon v. Lawson*, 759 S.E.2d 878, 883 (Ga.Ct.App.2014). But unreasonable conduct does not support such an inference. *See Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1333 (11th Cir.2006); *Marshall v. Browning,* 712 S.E.2d 71, 75 (Ga.Ct.App.2011); *Anderson v. Cobb*, 573 S.E.2d 417, 419 (Ga.Ct.App.2002). ***Even recklessly illegal conduct*** does not support an inference of actual malice. *See Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga.2007); *Daley v. Clark*, 638 S.E.2d 376, 386 (Ga.Ct.App.2006).

*Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir.2016) (emphases supplied).

To sum up, neither a Fourth Amendment violation nor allegedly unreasonable conduct add up to the "actual malice" required to pierce official immunity. Because Plaintiff lacks evidence to support actual malice, official immunity bars all state law claims against Det. Smith and the district court erred in concluding otherwise.

## B. PLAINTIFF'S INTENTIONAL INFLICTION CLAIMS FAIL AS A MATTER OF LAW

### i. PLAINTIFF CANNOT ESTABLISH OUTRAGEOUS CONDUCT OR SUFFICIENT DAMAGES

To prevail on a claim of intentional infliction of emotional distress, Plaintiff must demonstrate that: (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. "In fact, the defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Jarrard v. United Parcel Service*, 242 Ga. App. 58, 59, 529 S.E.2d 144 (2000); *Northside Hospital v. Ruotanen*, 246 Ga. App. 433, 435, 541 S.E.2d 66 (2000) ("extreme and outrageous" standard higher

than punitive damages standard); *Frank v. Fleet Finance*, 238 Ga. App. 316, 318, 518 S.E.2d 717 (1999). This is a significant burden that Plaintiff cannot meet in this case.

The "extreme or outrageous" element is a matter of law. *See Yarbray v. Southern Bell Tel. & Tel. Co.*, 261 Ga. 703, 706, 409 S.E.2d 835 (1991). To establish extreme and outrageous conduct, the activity in question must cause an average member of the community to exclaim "Outrageous!" *Williams v. Stepler*, 227 Ga. App. 591, 594, 490 S.E.2d 167, 170 (1997). Defendants' alleged conduct fails to rise to this level.

Intentional infliction claims cannot be grounded on "mere insults, indignities, threats, annoyances, petty oppressions, or other vicissitudes of daily living. Plaintiffs are expected to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind." *Jarrard v. United Parcel Svc.*, 242 Ga.App. 58, 59, 529 S.E.2d 144 (2000). Intentional infliction claims have been dismissed under more serious alleged conduct than that alleged by Plaintiff in the present case. *See, e.g., Law v. Harris*, 295 Ga.App. 628, 628, 673 S.E.2d 14, 15 (2009) (dismissing claim where pastor allegedly was "verbally abusive ..., humiliated her in front of other [C]hurch members, and made direct threats to [her]" etc.); *Wilcher v.*

*Confederate Packaging, Inc.*, 287 Ga.App. 451, 453, 651 S.E.2d 790, 792 (2007) (dismissing claim against manager based on assigning arduous labor to employee, confiscating employee's heater, obstructing employee's ability to complete her work, and making insulting statements); *Turnbull v. Northside Hosp.*, Inc., 220 Ga.App. 883, 884, 470 S.E.2d 464, 466 (1996) (dismissing claim based on glaring with purported anger and contempt, crying, slamming doors, and snatching phone messages from plaintiff's hand).

Moreover, whenever the conduct at issue directly relates to a desire to see the ends of justice served, malice cannot be inferred. Put differently "an investigative motive is not an improper motive or a desire other than to see justice served." *Bertuglia v. City of N.Y.*, 133 F. Supp. 3d 608, 635 (S.D.N.Y. 2015). Notably though, the alleged predicate acts that Plaintiff relies on were all done in the hopes of uncovering further evidence related to Devecio Rowland's dogfighting operation. The Plaintiff's allegations in this regard are that Det. Smith threatened to arrest her if she refused to cooperate in calling Rowland, he would arrest her; that he arrested her at work to embarrass her and that DFACS would be called for her children is she were arrested.

Clearly though, all of these statements were made to see the ends of justice served. Threats to have her arrested if she did not cooperate were

nothing more than Det. Smith exercising his discretionary authority. As for the location of the arrest, law enforcement officers are not obligated to arrest someone in the least embarrassing location. And finally, Det. Smith's statement that DFACs would get involved if were arrested was true. Her child with Devecio Rowland was a minor and because the underlying allegations related to the abuse of animals, DFACs would have had an interest to be involved and make sure that the children were not being abused themselves.

Further, in general, a plaintiff cannot show that emotional distress was "severe" without some evidence that he or she has sought professional counseling or medical treatment. See, e.g., *Jones v. Warner*, 301 Ga. App. 39, 42-43, 686 S.E.2d 835, 839 (2009)([B]ased on [the plaintiff's] . . failure to seek medical or psychiatric treatment for [her] symptoms, [she] could not show that her symptoms were sufficiently severe."); *Odem v. Pace Acad.*,235 Ga.App. 648, 656 510 S.E.2d 326, 333 (1998) (dismissing a claim of emotional distress where the plaintiff "sought no professional advice from doctors or counselors and discussed the matter only informally with his minister").

Accordingly, because Plaintiff has not produced any evidence that she received treatment related to the alleged emotional distress attributable to Det. Smith, her claims must fail.

### ii. THE IMPACT RULE BARS PLAINTIFF'S NEGLIGENT INFLICTION CLAIM

Georgia law prohibits compensation for negligent infliction of emotional distress, unless there is some physical impact. *Lee v. State Farm Mut. Ins. Co.,* 272 Ga. 583, 586, 533 S.E.2d 82, 85 (2000); *Ryckeley v. Callaway*, 261 Ga. 828, 829, 412 S.E.2d 826, 827 (1992); *H.J. Russell & Co. v. Jones*, 250 Ga.App. 28, 30, 550 S.E.2d 450, 453 (2001). Plaintiff does not even allege that Det. Smith caused a physical impact. Therefore, the impact rule bars Plaintiff's negligent infliction claims against Det. Smith.

## **CONCLUSION**

For the within and foregoing reasons, this Court should reverse the district court's denial of qualified immunity and official immunity and direct the court below to enter judgment in favor of Det. Josh Smith.

Respectfully submitted,

WILLIAMS, MORRIS & WAYMIRE, LLC

*/s/ G. Kevin Morris*
G. KEVIN MORRIS
Georgia Bar No. 523895

Bldg. 400, Suite A
4330 South Lee Street
Buford, Georgia 30518
678-541-0790
678-541-0789
kevin@wmwlaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in F.R.A.P. 32(a)(7)(B). This brief contains a total of 12735 words, which is less that the total amount provided for under the Rules.

This 8th day of February, 2022.

WILLIAMS, MORRIS & WAYMIRE, LLC

*/s/ G. Kevin Morris*
G. KEVIN MORRIS
Georgia Bar No. 523895
Attorney for Defendants

4330 South Lee Street, NE
Bldg. 400, Ste. A.
Buford, Georgia 30518
(678) 541-0790
(678) 541-0789
kevin@wmwlaw.com

-71-

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing **APPELLANTS' INITIAL BRIEF** upon all parties to this appeal through the Court's electronic filing system, as follows:

C. Victor Long
attjud@bellsouth.net

Kamau Kessonya Mason
kkmason@yahoo.com

This 8th day of February, 2022.

WILLIAMS, MORRIS & WAYMIRE, LLC


*/s/ G. Kevin Morris*
G. KEVIN MORRIS
Georgia Bar No. 523895
Attorney for Defendants

4330 South Lee Street, NE
Bldg. 400, Ste. A.
Buford, Georgia 30518
(678) 541-0790
(678) 541-0789
kevin@wmwlaw.com